**DOLLAR SYSTEMS, INC., Plaintiff,**

v.

**AVCAR LEASING SYSTEM, INC.; William Schroff; William Smoot, Conrad Marshall; and Ralph Apton, Defendants,**

**AVCAR LEASING SYSTEMS, INC., Counterclaim Plaintiff,**

v.

**DOLLAR SYSTEMS, INC.; Henry J. Caruso; E. Woody Francis; Kermit Whyte; Louis G. Merwin; Gary L. Paxton; and Paul Carls, Counterclaim Defendants.**

Civ. A. No. 86 1144 WDK (Kx).

United States District Court, C.D. California.

July 27, 1987.

Stephen Caruso, Los Angeles, Cal., Theodore Schwartz, Clayton, Mo., for plaintiff and counterclaim-defendants.

Conrad J. Marshall, pro per.

Brownstein Zeidman and Schomer, David J. Butler, James Rubinger, Washington, D.C., Irell & Manella, Henry Shields, Jr., Los Angeles, Cal., for Avcar Leasing Systems, Inc.

Ralph Apton, in pro per.

Henry Shields, Irell Manella, Los Angeles, Cal., for William Smoot.

David J. Butler, James Rubinger, Brownstein Zeidman and Schomer, Washington, D.C., Henry Shields, Jr., Irell & Manella, Los Angeles, Cal., for defendants/counterclaim plaintiffs Avcar Leasing Systems, Inc. and defendants William Schroff and William Smoot.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY AVCAR LEASING SYSTEMS, INC., WILLIAM SCHROFF, AND WILLIAM SMOOT

KELLER, District Judge.

### Introduction

Pursuant to Fed.R.Civ.P. 52, Local Rule 14.3, and the Court's Orders of April 28, and 29, 1987, defendant/counterclaim plaintiff Avcar Leasing Systems, Inc. ("Avcar") and defendants William Schroff and William Smoot submit these Proposed Findings of Fact and Conclusions of Law.

The Proposed Findings Of Fact incorporate the findings made orally by the Court on April 28, 1987; page references to the transcript of that day's trial proceedings are included in parentheses with respect to each finding. In addition, pursuant to the Court's direction, supplemental findings are included and are indicated by underscoring.

### I. FINDINGS OF FACT

#### A. *The Parties*

1. Plaintiff/counterclaim defendant Dollar Systems, Inc. ("DSI") is a Delaware corporation organized in 1979. DSI is the wholly-owned subsidiary of Dollar Rent A Car Systems, Inc. ("DRACSI"). (Tr. 169)

2. DSI is in the business of selling Dollar Rent A Car franchises. Its principal place of business is in Los Angeles, California. (Tr. 169)

3. Counterclaim defendant Henry J. Caruso was at all relevant times an officer and director of both DSI and DRACSI. (169)

4. Counterclaim defendant E. Woody Francis was at all relevant times an officer of DSI and DRACSI, and a Director of DSI. (Tr. 169)

5. Counterclaim defendant Louis G. Merwin was at all relevant times an officer and a director of DSI and DRACSI. (Tr. 170)

6. Counterclaim defendant Gary L. Paxton was at all relevant times an officer of DSI and DRACSI. (Tr 170)

7. Counterclaim defendant Kermit Whyte was at all relevant times an officer of DSI. (Tr. 170)

8. Counterclaim defendant Paul Carls was at all relevant times an officer of DSI and DRACSI. (Tr. 170)

9. Avcar is a Virginia corporation organized in 1983. (Tr. 182)

10. William Schroff was and is President, a Director, and a shareholder of Avcar. (Tr. 182)

11. William Smoot was and is a shareholder of Avcar. (Tr. 182)

12. Ralph Apton was and is a shareholder of Avcar. (Tr. 182)

13. Conrad Marshall was and is a shareholder of Avcar. (Tr. 182)

B. *The Negotiation and Execution of the License Agreement*

14. Avcar and DSI held their first face-to-face meeting to discuss the possibility of the sale of a Dollar Rent A Car franchise to operate in the Washington, D.C. area on May 14, 1984. That meeting took place at DSI's headquarters in Los Angeles, California. (Tr. 184) Messrs. Marshall, Apton, Schroff, Caruso, and Francis were present at the meeting and discussed *inter alia*, the leases and concession agreements for Baltimore/Washington International Airport and the airport lease and concession agreement for Dulles International Airport, as well as the construction of a service facility at Dulles. (Tr. 76)

15. On June 1, 1984, Avcar and DSI held their second personal meeting in DSI's Los Angeles offices. At that meeting, Mr. Marshall gave Mr. Francis a personal check in the amount of $50,000, and requested that Mr. Francis not cash it. Mr. Marshall's personal check was replaced by an Avcar corporate check on or about June 7, 1984. (Tr. 185) The $50,000 payment was a deposit towards Avcar's $500,000 franchise fee asset purchase. (Tr. 188)

16. On June 15, 1984, Avcar and DSI executed the License Agreement at DSI's offices in Los Angeles, and Avcar paid DSI an additional $150,000. The balance of the $500,000 was to be paid by an Installment Note for $300,000, which is annexed to the License Agreement as Addendum II. (Tr. 188)

17. At the June 15, 1984 meeting, DSI insisted on making material changes in the nature of the transaction. Until that time, the transaction being discussed included the sale of a DRACSI subsidiary, Dollar Rent A Car—Washington, Inc., to Avcar. On June 15, 1984, Mr. Caruso refused to include the sale of the subsidiary in the deal. (Tr. 188–89)

C. *DSI's Failure to Register or Become Exempt*

18. At the time the License Agreement was executed, DSI was not registered to offer or sell franchises in California, Maryland, or Virginia. (Tr. 189)

19. At the time the License Agreement was executed, DSI had not filed a Notice of Exemption in California or Maryland. (Tr. 189)

20. In the calendar years 1983 and 1984, Dollar Rent A Car Systems, Inc., the parent of Dollar Systems, Inc. had a net worth in excess of $5,000,000.00, and Dollar Systems, Inc. the franchisor and wholly-owned subsidiary of Dollar Rent A Car Systems, Inc. had a net worth in excess of $1,000,000.00. (Tr. 151–52)

21. Dollar Systems, Inc. had at least 25 franchises conducting business during calendar years 1983 and 1984. (Tr. 157–58)

### D. *DSI's Disclosure*

#### 1. *Timeliness*

22. At the end of the June 15, 1984 meeting in Los Angeles, at which the License Agreement was executed, DSI provided Mr. Schroff with a copy of an FTC Disclosure Document, dated July 30, 1982 ("the 1982 disclosure document"). No other document purporting to be an FTC Disclosure Document, a Uniform Franchise Offering Circular, or any other form of prospectus was ever provided to Avcar, or to any of its principals. (Tr. 189)

23. Mr. Francis did not provide Mr. Schroff with a disclosure document in Francis' office on May 9, 1984, as DSI asserts. Messrs. Schroff and Marshall held a lunch meeting in McLean, Virginia at noon on May 9, 1984, and subsequently met with Mr. George Bramhall of The McLean Bank until 1:30 p.m. Those meetings are reflected in Marshall's daily diary record, his attorney time study, and his bill to Avcar dated July 17, 1984. (Tr. 189–90) Those records were prepared contemporaneously, according to the testimony of Mr. Marshall and his then-secretary, Patricia Dooling, who left Marshall's employ in May 1985. Mr. Bramhall recalls meeting with Messrs. Marshall and Schroff in May 1984, but cannot recall the date of that meeting, and has no documents reflecting the date of that meeting.

24. There is no evidence that Schroff travelled to California after his meeting in Virginia, or that he could have arrived in Los Angeles for a meeting with Francis during the day of May 9, 1984. Francis, not Schroff, wrote the date "5–9–84" on the Receipt that Schroff signed for the 1982 disclosure document. (Tr. 189–90) The Court does not credit Francis's testimony that the meeting occurred on May 9, 1984, nor Francis's diary which contains an entry of a meeting with Schroff on May 9, 1984 at 10:30 a.m., particularly in light of Francis's testimony that the May 9 meeting occurred in the afternoon, not at 10:30 a.m.

#### 2. *Contents*

25. The 1982 FTC disclosure document that DSI provided Avcar did not purport to be the disclosure document required by the large franchisor exemption of the California Franchise Investment Law ("Cal. FIL") § 31101. While the information contained in the 1982 FTC disclosure document included the information required by § 31101, that information was outdated when provided to Avcar in 1984.

26. The 1982 FTC disclosure document does not set forth all the information required to be disclosed by the Cal. FIL, or the Maryland Franchise Law ("Md. FL") and regulations promulgated thereunder.

27. The California Corporations Commission entered a Desist and Refrain Order in December 1976 against DRACSI, Henry J. Caruso, and E. Woody Francis. The Desist and Refrain Order states, in pertinent part:

> [Y]ou are hereby ordered to desist and refrain from the further offer and sale in the State of California of franchises in Dollar Rent–A–Car Systems, Inc., for the reason that ... the sale of such franchises is subject to registration ... and such franchises are being, or have been, offered for sale without first being so registered.

The only reference to the Desist and Refrain Order in the 1982 disclosure document states in full:

> Dollar Rent A Car System, Inc.'s cease and desist order issued by California Corporation Commission concerning the offering of licenses within the State of California. (Tr. 203)

28. The 1982 disclosure document contained DSI's profit and loss statements and balance sheet for fiscal year 1981, but did not contain any other financial information relating to DSI. (Tr. 203–04)

29. Avcar was not provided with DSI financial statements for 1982 and 1983, and did not receive the 1981 financial statement until it received the 1982 disclosure document on June 15, 1984. (Tr. 204–17)

30. The 1982 disclosure document did not include disclosure of certain civil actions involving DSI that were filed after July 1982 and before June 1984, as revealed by DSI's 1986 disclosure document. (Tr. 218) There is evidence that Avcar did not consider the litigation disclosed in the 1982 disclosure document to be material, but, as Mr. Marshall testified, Avcar's belief was based at least in part on the fact that all the civil actions disclosed were over two years old.

31. The 1982 disclosure document failed to disclose the existence of two criminal convictions (one of DSI, one of Dollar Rent A Car—Wisconsin, Inc. (a wholly owned DRACSI subsidiary)), involving unlawful franchise sales activity in Wisconsin. (Tr. 218–19)

32. The 1982 disclosure document stated that there was no requirement of prepaid rent. It goes on to say that would depend on the location selected by the licensee and the type of building utilized. (Tr. 232) After the execution of the License Agreement, DSI and DRACSI required Avcar to prepay the first and last month's rent on DRACSI's facility near Washington National Airport, and to pay a security deposit as well. This required payment amounted to $40,000. (Tr. 233)

33. After execution of the License Agreement, DSI required Avcar to pay $43,125 for improvements at Baltimore Washington Airport. That required payment was not disclosed prior to the execution of the License Agreement. See Exhibit 158. (Tr. 233)

E. *Avcar's Knowledge*

34. Avcar had no knowledge of any of the above-stated facts that DSI failed to disclose. While Schroff had been an employee of DRACSI at one time, he was terminated in May 1976; he worked exclusively in Atlanta and Memphis, never at DRACSI's headquarters in Los Angeles; and he was never involved in franchise sales. Schroff was unaware of the facts that DSI failed to disclose. (Tr. 234)

35. Avcar had no knowledge of its rights under the California and Maryland franchise statutes until it retained its present counsel in this action. (Tr. 234)

F. DSI's Lack of Effort To

*Comply With Franchise Laws*

36. DSI and DRACSI have been involved in franchising since 1966. (Tr. 234)

37. DSI and DRACSI have been aware of state franchise laws since the early 1970's. (Tr. 234–35)

38. DSI failed to take steps adequate to ensure compliance with state franchise laws. (Tr. 235)

39. DSI was unaware of the requirement of filing a Notice of Exemption in order to qualify for the "large franchisor" exemption from the registration and disclosure requirements of the California and Maryland laws. DSI's ignorance of these requirements was due to its gross negligence in failing to apprise itself of franchise law requirements, including its failure to make adequate inquiry and its failure to subscribe to legal journals that apprise franchisors of franchise law requirements, despite its prior franchise law violations and long experience in franchising. (Tr. 235)

40. The contents of DSI's 1982 disclosure document indicate a disregard for the requirements of the Federal Trade Commission Rule concerning franchise sales, 16 CFR § 436.1. (Tr. 235)

41. DSI made no effort to comply with the disclosure requirements of Virginia law. (Tr. 236)

42. DSI knew that it had not registered in California or Maryland. (Tr. 236)

43. DSI knew that it had not filed a Notice of Exemption in California or Maryland. (Tr. 236)

G. *The Conduct of Avcar's Business*

44. On or about July 1, 1984, Avcar took over the operations of Dollar Rent A Car Washington, Inc. at Washington National Airport, Dulles International Airport, and Baltimore/Washington International Airport, pursuant to the License Agreement. (Tr. 26)

45. At the time of the transition, representatives of Dollar Systems, Inc. were at the airport location on Jefferson Davis Highway at Washington National Airport to assist Avcar. Eleanor MacFarland, assistant vice-president of accounting procedures, rendered valuable consultive and professional services during this period. (Tr. 42)

46. In the initial stages of the operation, Avcar sales, in terms of volume, exceeded those of Dollar's past experience. From the time of taking possession through September of 1984, Avcar earned a profit. By the end of calendar year 1984, Avcar began to default in the payment of system fees and had not paid the October through December systems fees to Dollar Systems, Inc. (Tr. 42–43)

47. When Avcar took over the operations at Washington National Airport, Dulles International Airport and Baltimore/Washington International Airport on July 1, 1984, Avcar assumed the fleet previously used by Dollar Rent A Car—Washington, Inc. Avcar assumed the outstanding debt on that fleet, though Dollar Rent A Car Systems, Inc. remained liable to the automobile companies on the loans for those automobiles. The value of the fleet when Avcar took control was somewhere between $150,000 and $483,000. The Court finds that the evidence is insufficient to state a particular value, but the value is most probably closer to $150,000 than to $483,000. (Tr. 89)

48. After July 1, 1984, when Avcar took over the operations of BWI and Dulles, Avcar obtained approximately $35,065.38 in rental revenue that was due to Dollar. Avcar also obtained gasoline in the approximate value of $19,093.66 which it resold to customers, and S & H Green Stamps in the amount of $7,051.75, all of which Avcar agreed to pay per Addendum I to the License Agreement. A dispute arose concerning Avcar's obligations to pay Dollar these sums. That dispute was compromised by Avcar's payment to Dollar of $26,832.00. (Tr. 106)

49. As of January 9, 1985, slightly more than six months after Avcar had been in operation, Avcar was in default of payment of fees and other charges to Dollar Systems, Inc. in the amount of $129,000. Thereafter, Avcar was repeatedly advised of its defaults in the performance of its License Agreement by reason of Avcar's failure to pay monies due and owing not only to Dollar Systems, Inc. but to various airport authorities. (Tr 43)

50. In a letter dated June 24, 1985, Mr. Schroff wrote to Mr. Bramhall, Vice–President of the McLean Bank in McLean, Virginia, wherein he stated in part at page 2: "We presently run approximately $10,000,-000.00 a year through our regular checking and credit card accounts at United Virginia Bank." (Tr. 149)

51. Avcar failed to file monthly systems reports with Dollar on a timely basis, Avcar failed to file monthly financial statements at all, Avcar failed to pay or paid in an untimely fashion reservation fees, system fees, airport lease and concession fees, and some other creditors, all in violation of the terms and conditions of the License Agreement between Avcar and Dollar Systems, Inc., and Avcar preferred creditors to the detriment of Dollar. (Tr. 149–50)

52. On September 24, 1985, Avcar, through its representative, Conrad Marshall, met with Mr. Caruso to discuss the debts due Dollar Systems, Inc. by Avcar. Mr. Caruso agreed not to exercise any rights of termination that Dollar Systems, Inc. might have, but permitted Avcar to continue operating as a Dollar licensee on Avcar's timely payment of its arrearages and agreement to pay the balance within 90 days. Mr. Marshall told Mr. Caruso that Mr. Schroff was attempting to obtain additional financing and hoped to have the financing within 90 days. Mr. Caruso believed that Avcar had a commitment for additional financing at that time, but Mr. Marshall did not represent that there was such a commitment. (Tr. 87)

53. After the termination of the License Agreement, Avcar continued to operate under the Dollar name until June 1986, but was just receiving cars previously rented during the month of May 1986. (Tr. 88)

54. Notwithstanding the Notice of Termination of the License Agreement and the demand by Dollar pursuant to the termination to cease operations, to turn over all operating locations on all airport concessions and agreements, Avcar failed and refused to return any of the aforesaid to Dollar. (Tr. 59–63)

55. Avcar with great regularity did not operate its business in compliance with the requirements of the License Agreement. For instance, Avcar failed to make monthly payments or to file monthly system or financial reports in a timely fashion. (Tr. 236; April 29, 1987 transcript)

56. Avcar did not usually conduct its business in a manner consistent with good business practice. (Tr. 236)

57. Avcar's business conduct was the result of negligence and lack of skill. Avcar did not engage in any conduct designed purposely to defraud or injure DSI. (Tr. 236)

58. During at least one period of time, Avcar rented cars without having liability insurance, with the knowledge of Mr. Schroff. (Tr. 68)

59. Avcar failed to file any federal tax returns for the year 1985. (Tr. 168–69)

### H. *Dollar's Payments*

60. Dollar has paid the sums of $58,-200.00 in the form of rent (of which $38,-800.00 was paid by Dollar Rent A Car Systems, Inc.), the sum of $2,085.75 for airport bonds, the sum of $7,650.00 for frequent flyer program, the sum of $4,986.55 for property taxes, and the sum of $174,947.54 as a deficiency to Ford Motor Credit, the sum of $103,065.15 for airport leasing and concession payments, reservations payments in the amount of $211,-011.04, $2,985.13 for the Textron Car Wash, $13,994.05 for auto repairs to Crystal City Auto Repair, $5,728.78 to Ferndale Ford for automobile repairs, for a total amount paid by Dollar of $609,058.32. (Tr. 138–41)

### H. *Avcar's Payments*

61. Avcar paid DSI $50,000 on June 1, 1984 (replaced by corporate check dated June 7, 1984) and $150,000 on June 15, 1984 as a down payment.

62. Avcar paid DSI $29,763.80 on the Installment Note that appears as Addendum II to the License Agreement.

63. Avcar paid DSI system fees of $155,538.47 pursuant to the License Agreement.

64. Avcar paid DSI $43,199.22 in reservations fees pursuant to the License Agreement.

65. Avcar paid DSI $5,704.73 for supplies pursuant to the License Agreement.

66. Avcar paid $205,785.21 in rent and taxes, and an additional $30,000.00 up-front payment on the property on Jefferson Davis Highway, Arlington, Virginia, near National Airport.

67. Avcar paid DSI $26,832 in settlement of a dispute relating to amounts owed for accrued revenue, gasoline and S & H Green Stamps.

68. Avcar paid $12,600.00 for improvements at Baltimore Washington Airport.

70. On execution of the License Agreement, Avcar, Messrs. Schroff, Smoot, Marshall, and Apton, executed guaranties on obligations to General Motors Acceptance Corporation ("GMAC") for cars they were taking over from Dollar. GMAC is now suing the individual guarantors in Virginia state court arising out of those guaranties.

## II. CONCLUSIONS OF LAW

1. The franchise laws of California, Maryland, Virginia, and the United States each applied to DSI's sale of a franchise to Avcar. California Franchise Investment Law ("Cal.FIL") § 31013; California Comm. of Corps. Op.No. 79/3F; Maryland Franchise Law ("Md.FL") § 345; Virginia Retail Franchising Act ("Va. RFA") § 13.1-557; FTC Rule, 16 C.F.R. § 436.1.

2. DSI did not qualify for the "large franchisor" exemption provided by the Cal. FIL and Md.FL in that prior to selling the franchise to Avcar, DSI failed to

file the Notice of Exemption required by both the Cal. FIL and the Md.FL to qualify for the large franchisor exemption. Cal. FIL § 31101(e); Md.Regs. § .04C.[1]

3. Neither the Va. RFA nor the FTC Rule contains a large franchisor exemption. Accordingly, DSI was required to comply with the requirements of those laws irrespective of its size.

4. DSI's sale of a franchise to Avcar was unlawful in that it was neither registered nor exempt. Cal. FIL §§ 31101, 31110; Md. FL § 347(a); Va. RFA § 13.1–560.

5. DSI's sale of a franchise to Avcar was unlawful in that DSI failed to present Avcar with a prospectus at least 10 business days before the payment by Avcar to DSI of any consideration. Cal. FIL § 31119. Avcar received the 1982 disclosure document on June 15, 1984, at least eight days <u>after</u> Avcar first paid consideration to DSI, June 7, 1984.

6. DSI's sale of a franchise to Avcar was unlawful in that DSI failed to provide Avcar with a prospectus at the first personal meeting at which the sale of the franchise was discussed, which occurred on May 14, 1984. Md. FL § 357; FTC Rule 16, CFR §§ 436.1(a), 436.2(g).

7. DSI's sale of a franchise to Avcar was unlawful in that DSI failed to provide Avcar with a prospectus at least 72 hours before execution of the Franchise Agreement. Va. RFA § 13.1–565(c).

8. Quite apart from the untimeliness of DSI's disclosure, DSI violated the disclosure requirements of all applicable franchise laws in the following respects:

a. DSI failed to disclose the "penalty imposed" by the California Desist and Refrain Order, which was a prohibition on selling franchises in California. Cal. FIL § 31111(e); Md. FL § 349; Va. Regs. 12, Item III.A.1 [2]; FTC Rule, 16 CFR § 436.1(a)(4)(iii).

b. DSI failed to disclose that the California Desist and Refrain Order applied to Caruso and Francis, the two persons principally involved in DSI's sale of a franchise to Avcar. Cal. FIL § 3111(e); Md. FL § 349; Va. Regs. 12, Item III. A.1; FTC Rule, CFR § 436.1(a)(4)(iii).

c. DSI failed to disclose the Wisconsin criminal proceedings involving it and Dollar Rent A Car—Wisconsin, Inc. Item 3.B of the Uniform Franchise Offering Circular ("UFOC") requirements,[3] which apply in California, Maryland, and Virginia, requires disclosure of all legal proceedings within 10 years that "involved violation of any franchise law." Cal.Regs. 310.-114.1;[4] Md. Regs. .02, Item 3.B; Va. Regs 12, Item III. The FTC Rule contains a similar requirement, 16 CFR § 436.1(a)(4)(i)(ii). Both Wisconsin proceedings involved franchise law violations.

d. DSI failed to disclose the existence of at least five civil actions then pending against it, in violation of Cal. Regs. § 310.114.1(c)(2); Md. Regs. .02, Item 3A; Va. Regs. 12, Item III.A; and 16 CFR § 436.1(a)(4)(ii).

e. DSI failed to provide Avcar with the financial information required by law, particularly audited financial statements for each of the three previous fiscal years prior to 1984. Cal. Regs. § 310.11.2; Md. Regs. .02, Item 21; Va. Regs. 12, Item XXI; FTC Rule 16 CFR § 436.1(a)(20).

9. DSI violated §§ 31101 or 31110, and 31119 of the Cal. FIL and § 347(a) of the Md. FL in its sale of a franchise to Avcar.

---

1. Md. Regs. refers to the regulations promulgated under the Md. FL, which can be found at 1 Business Franchise Guide ("BFG") (CCH) ¶ 5200.

2. "Va. Regs." refers to the regulations promulgated under the Va. RFA, which can be found at 1 BFG ¶ 5460.

3. The UFOC requirements can be found at 1 BFG ¶ 5700 et seq.

4. "Cal.Regs." refers to the regulations promulgated under the Cal. FIL, which can be found at 1 BFG ¶ 5050.

■ 10. DSI's violations of the Cal. FIL were "willful" within the meaning of Cal. FIL § 31300. In that context, "willful" means an <u>act</u> that is committed knowingly and intentionally. There is no requirement of a showing of an intent to violate the law, an evil motive, or a purpose to gain undue advantage. Good faith or reasonable care are not defenses to "willfulness" under the statute. The Court bases its interpretation of "willful" on the following authorities:

a. § 31300 itself provides a defense of "reasonable care" for violations of §§ 31200 and 31202, but not for violations of §§ 31101, 31110, and 31119. Under the plain meaning of § 31300, a franchisor may willfully violate §§ 31101, 31110, and 31119 even if it exercised reasonable care.

b. § 31410 of the Cal. FIL provides criminal penalties, including imprisonment or fines, for willful violations. However, § 31410 prevents imprisonment of persons who had no knowledge of the law. Thus, under § 31410, one may commit a willful violation and be subjected to a criminal fine even if he had no knowledge of the law.

c. California state courts have so interpreted the word "willful" in the criminal provisions of the Cal. FIL. *People v. Gonda*, 138 Cal.App.3d 774, 188 Cal.Rptr. 295 (1st District 1983).

d. The rules of statutory construction require that a word be construed to have the same meaning in different sections of the same statute. Sutherland Statutory Construction § 47.16 p. 161 (4th ed.).

e. The word "willful" has been so construed in other civil statutes. *National Steel and Shipbuilding Co. v. OSHA*, 607 F.2d 311 (9th Cir.1979); *Gilderhus v. Amoco Oil Co.*, 1980–81 Trade Cases (CCH) ¶ 63,648 (D.Minn. 1980).

11. Avcar is entitled to rescission of the License Agreement under Cal.FIL § 31300.

■ 13. Rescission of the License Agreement requires dismissal of all of DSI's claims, which arise under that Agreement.

■ 14. Rescission of the License Agreement discharges the liability of all of the individual guarantors of that Agreement.

■ 15. The relief to which Avcar is entitled on rescission is governed by Cal. Civ.Code § 1692. Section 1692 requires the Court to award "complete relief, including restitution of benefits, if any, conferred by the [aggrieved party] as a result of the transaction and any consequential damages to which he is entitled...." Section 1692 also permits the Court to "<u>adjust the equities between the parties.</u>"

18. The Court bases its award on a weighing of the equities between the parties pursuant to § 1692. In reaching its conclusion, the Court has considered all arguments set forth by all the parties throughout the course of the trial of this action. The Court has found that DSI violated the California, Maryland, Virginia, and federal laws in its sale of a franchise to Avcar, that DSI was grossly negligent in its compliance with state franchise laws, and that DSI made minimal efforts to comply with those laws, despite several previous encounters with the franchise laws and nearly twenty years' experience in franchising. Particularly troubling to the Court is DSI's apparent attempt to falsify the receipt for the 1982 disclosure document. It is undisputed that Mr. Francis, not Mr. Schroff, wrote the date "5–9–84" on that receipt. The evidence is compelling that Mr. Schroff was in Virginia, not California, on May 9, 1984. Mr. Marshall's contemporaneous time records indicate a lunch meeting with Mr. Schroff in Virginia on that date. Mr. Marshall's then-secretary, Patricia Dooling, prepared the Avcar time study and bill from Mr. Marshall's diary in July 1984, at a time when the May 9, 1984 date was of no consequence. Indeed, Ms. Dooling left Mr. Marshall's employ in May 1985, some eight months before this lawsuit was commenced. There is no evidence that the "5–9–84" date was entered on the receipt before Avcar asserted DSI's franchise law violations. The

only other document on which DSI relies is Mr. Francis's calendar, which shows a 10:30 a.m. meeting with Mr. Schroff on May 9, 1984. But, Mr. Francis conceded that his calendar was inaccurate. After hearing Mr. Marshall's testimony about Mr. Schroff's May 9, 1984 lunch meeting in Virginia, Mr. Francis testified that his meeting with Mr. Schroff must have been in the afternoon of May 9, 1984, not at 10:30 a.m. as his calendar showed.

19. In doing equity between the parties, the Court cannot excuse the kind of conduct evidenced by DSI's attempted fabrication of the May 9, 1984 date. The Court finds this conduct warrants an award of attorneys' fees to Avcar's counsel and to Mr. Apton.

■■■ 20. The Court has also considered Avcar's conduct of its business under the License Agreement. The Court has found that Avcar consistently breached its License Agreement with DSI to DSI's detriment, and that Avcar often acted irresponsibly in the conduct of its business. The Court has considered such evidence in the context of DSI's "unclean hands" defense to Avcar's counterclaims, and determines that Avcar's conduct does not rise to the level of "unclean hands." The Court has also considered such evidence in the context of § 1692. In weighing the equities under § 1692, the Court concludes that in the interest of justice, Avcar's conduct precludes it from recovering the majority consequential damages (*i.e.*, its business losses).

IT IS SO ORDERED.

1. The Court rejects Dollar's argument that the entire $200,000 advanced by Avcar to DRACSI was payment for the fleet and furniture. The Court believes the parties did not differentiate between payments for the franchise and payments for the assets and would be inclined to pro rate the payments made. However, because of the broad view taken by the Court (see the note below), this distinction is of no moment. Even if the entire sum was intended to be applied to the purchase of the assets, it is properly recoverable as a item of restitution given the awarding of the corresponding set-offs for the value of the assets.

### On Exhibits Submitted Re May 9 Issue

■■■ For the record, the Court wishes to specify the state and extent of the evidence used in reaching its findings. In response to the Court's request to make further discovery regarding the "May 9 issue", the parties took the depositions of George Bramhall and Patricia Dooling. (Copies attached to Avcar's Brief re May 9 Issue as Exhibits B and C.) Additionally, Dollar obtained the American Express records of Mr. Schroff's account by subpoena. No party has registered any evidentiary objections to these documents. Accordingly, the clerk is ORDERED to receive them into evidence. The documents submitted by Mr. Marshall are not within the scope of further discovery contemplated by the Court and the parties. Therefore, they will not be received into evidence.

IT IS SO ORDERED.

### ON DAMAGES

■■■ This matter was presented to this Court sitting in equity. Having heard the evidence and arguments of counsel, the Court hereby makes the following findings regarding the award of damages under § 1692 of the California Civil Code:

1. Avcar Leasing System, Inc. (Avcar) is entitled to recover the following items of restitutionary damages:

| | |
|---|---|
| Cash purchase money for license agreement | $200,000.00[1] |
| Installment payments on franchise note | 29,763.80 |
| Advance last month's rent and security deposit | 30,000.00* |
| Payments on BWI improvements (7/84—12/85 @ $700/month) | 12,600.00* |
| Reservation fees | 43,199.22 |
| System fees | 155,538.47 |
| Unallocated payments | 5,827.48 |

* Recognizing the intertwined nature of the various Dollar entities, the Court has chosen to consider the evidence regarding all the Dollar entities in an effort to achieve the most equitable result between the parties. Those items reflecting this view are indicated with an asterisk. The Court acknowledges that were it to accept the argument advanced by Avcar, that DSI is the only proper plaintiff and counter-defendant, these items would not properly be characterized as "restitutionary" in nature.

| | |
|---|---|
| Supplies | 5,704.73 |
| Rent and taxes (including first month's rent) | 205,785.21 * |
| Gas and S & H stamps | 26,832.00* |
| Total: | $715,250.91 |

2. Dollar Systems, Inc. (Dollar) is entitled to the following set-offs, for benefits conferred:

| | |
|---|---|
| Net value of fleet at time of turnover | $150,000.00 * |
| Value of furniture at time of turnover | 60,000.00 * |
| Rental value of BWI facility (7/84—2/86 @ $700/month) | 14,000.00 * |
| Reservation arrangements | 43,199.22 |
| Supplies | 5,704.73 |
| Rent and taxes (including first month's rent) | 205,785.21 * |
| Gas and S & H stamps | 26,832.00 * |
| Total: | $505,521.16 |

 3. Additionally, Dollar shall indemnify and hold harmless Avcar and the individual guarantors for any liability to General Motors Acceptance Corporation or Ford Motor Credit Company arising from the assumption and guaranty agreements on the fleet in existence at the time of the turnover to Avcar. The Court considers this limited award of consequential damages appropriate because these guarantees were inextricably intertwined with the execution of the license agreement which the Court has rescinded.

4. Dollar shall pay the attorneys' fees and costs incurred by Avcar and the individual defendants in defending and prosecuting this action. With regard to costs, each party must timely file a bill of costs in conformance with Local Rule 16.-3.3 to recover costs.

The Court will award Avcar, Mr. Schroff and Mr. Smoot their attorneys' fees with the exception of those fees incurred in presenting: (1) Avcar's counsel's motion to withdraw, and (2) Avcar's opposition to Dollar's two Motions to Strike (based on discovery disputes arising from Mr. Schroff's noncooperation). Counsel for Avcar shall submit a statement setting forth the extent of fees and expenses arising from these motions within two weeks from the date of this order.

Mr. Apton is awarded $1335.00 in attorneys' fees.

5. No party is entitled to recover interest for any time prior to the date of entry of judgment.

6. No party is entitled to recover any consequential damages other than those set forth above.

7. Counterclaim defendants Henry J. Caruso, E. Woody Francis and Dollar are jointly and severally liable pursuant to California Corporations Code § 31302. All other counterclaim defendants are DISMISSED.

8. The counterclaim of Ralph Apton for violations of the Robinson-Patman Act is DISMISSED. The counterclaimant failed to adduce any evidence of price discrimination which had the effect, intended or otherwise, of eliminating competition. Therefore, the counterclaim defendants, Dollar Ren-A-Car Systems, Inc., Century Investments and Dollar Rent-A-Car of Washington, Inc. are DISMISSED.

The Court ruled in Mr. Apton's favor on his counterclaim for recission. His relief on that counterclaim is limited to that set forth in Items 3 and 4.

IT IS SO ORDERED.